IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

JAMES DEWAYNE BARNETTE,

    Defendant.

Case No. 77-20014-JAR-1

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendant James Dewayne Barnett's[1] "'Emergency' Motion for Compassionate Release" (Doc. 117) under 18 U.S.C. § 3582(c)(1)(A). The motion is fully briefed, and the Court is prepared to rule. For the reasons provided below, the Court dismisses the motion for lack of jurisdiction.

**I.    Background**

On July 5, 1977, a jury sitting in the District of Kansas convicted Barnett of kidnapping, in violation of 18 U.S.C. § 1201; assault, in violation of 18 U.S.C. § 113(a); and maiming, in violation of 18 U.S.C. § 114.[2] On August 9, 1977, United States District Judge Earl E. O'Connor sentenced Barnett to life imprisonment on the kidnapping count, a 20-year term of imprisonment on the assault count, and a 7-year term of imprisonment on the maiming count, with each sentence to run concurrently.[3] These sentences were ordered to run consecutively to

---

[1] Barnett's last name is spelled "Barnette" in the case caption and the Superseding Indictment. According to Barnett's compassionate release filings, *see* Docs. 117, 125, the Bureau of Prisons' records, *see* Docs. 117-1, 124-1, 128-1, and the Presentence Investigation Report, the correct spelling of his name is "Barnett." The Court therefore uses "Barnett" in this Order.

[2] Doc. 36.

[3] Doc. 45. Although Barnett was 21 years old on the date of conviction, Judge O'Connor found that "he would not benefit from handling under the Federal Youth Corrections Act." *Id.*

the 10-year sentence Barnett was then serving for a prior conviction for sodomy and intent to commit rape.[4]

Less than a decade later, on August 7, 1985, Barnett pleaded guilty in the Western District of Oklahoma to assaulting a correctional officer with a deadly weapon at FCI El Reno, in violation of 18 U.S.C. §§ 111 and 1114.[5] He was sentenced to a 10-year term of imprisonment, to run consecutively "to any other sentence imposed."[6]

Barnett is incarcerated at FCI Hazelton in Bruceton Mills, West Virginia. He is 65 years old and has no projected release date, though he asserts that his projected release date was January 14, 2019.[7] As of June 30, 2021, the Bureau of Prisons ("BOP") reports that 184 inmates have tested positive for COVID-19 out of 1,207 inmates tested at this facility.[8] The BOP further reports that FCI Hazelton has no active inmate cases, one active staff case, and one inmate death attributed to COVID-19.[9] Within the broader Hazelton correctional complex, which includes FCI Hazelton and USP Hazelton, 387 staff members and 1,943 inmates have been fully vaccinated against COVID-19 to date.[10] Barnett received the first dose of the COVID-19 vaccine on March 9, 2021.

On March 8, 2021, Barnett filed a motion requesting compassionate release on the ground that the combination of his medical conditions place him at an increased risk for severe illness from COVID-19. Barnett is 65 years old and suffers from obesity, asthma, and type 2

---

[4] *Id.*; PSR at 2.

[5] W.D. Okla. Case No. 85-00188.

[6] *Id.*

[7] Doc. 117 at 4.

[8] *COVID-19 Coronavirus*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited July 6, 2021). Five COVID-19 tests remain pending. *Id.*

[9] *Id.*

[10] *Id.*

diabetes. He requests that the Court reduce his sentence to time served. In the alternative, he requests that the Court allow him to serve the remainder of his sentence on home confinement as a condition of supervised release. Barnett has proposed a release plan to live with his sister and her father in Oklahoma City, Oklahoma, which has been verified and approved by the U.S. Probation Office for the Western District of Oklahoma.

Pursuant to District of Kansas Standing Order 19-1, the Federal Public Defender ("FPD") entered an appearance and filed a reply on Barnett's behalf asserting additional grounds for compassionate release.[11] The FPD also filed supplemental materials to Barnett's *pro se* motion, including his medical records, a "Male Pattern Risk Scoring" form obtained from the BOP assessing his risk of recidivism, four letters from family members in support of Barnett, and several family photographs.[12]

## II.     Legal Standard

"Federal courts are forbidden, as a general matter, to modify a term of imprisonment once it has been imposed, but th[at] rule of finality is subject to a few narrow exceptions."[13] "One such exception is contained in [18 U.S.C.] § 3582(c)(1)."[14] Section 3582(c)(1)(A), as amended by the First Step Act of 2018,[15] permits a court to reduce a term of imprisonment "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Before

---

[11] Docs. 121, 125.

[12] *See* Docs. 125-3, 125-4, 128, 132.

[13] *United States v. Maumau*, 993 F.3d 821, 830 (10th Cir. 2021) (quoting *Freeman v. United States*, 564 U.S. 522, 526 (2011)).

[14] *Id.*

[15] Pub. L. No. 115-391, 132 Stat. 5194.

3

reducing a term of imprisonment, a court must find that (1) "extraordinary and compelling reasons" warrant a sentence reduction, (2) such a reduction is consistent with "applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors set forth in 18 U.S.C. § 3553(a) support such a reduction.[16]

"Unless the basis for resentencing falls within one of the specific categories authorized by section 3582(c), the district court lack[s] jurisdiction to consider [the defendant's] request."[17] "[Tenth Circuit] cases thus require the movant to show that § 3582(c) authorizes relief for the court to have jurisdiction."[18] In other words, if the defendant cannot show that § 3582(c) authorizes relief, the Court must dismiss the motion for lack of jurisdiction.

## III. Discussion

### A. Exhaustion

Barnett sent a letter to the warden of FCI Hazelton requesting compassionate release, which the warden subsequently denied on October 9, 2020.[19] The government does not dispute that this satisfies § 3582(c)(1)(A)'s exhaustion requirement. The Court thus considers whether Barnett's request is supported by extraordinary and compelling reasons and whether the applicable § 3553(a) sentencing factors weigh in favor of a sentence reduction.

---

[16] 18 U.S.C. § 3582(c)(1)(A); *see United States v. McGee*, 992 F.3d 1035, 1042 (10th Cir. 2021).

[17] *United States v. Saldana*, 807 F. App'x 816, 819 (10th Cir. 2020) (quoting *United States v. Brown*, 556 F.3d 1108, 1113 (10th Cir. 2009)) (vacating the district court's order denying a § 3582(c)(1)(A) motion and remanding with instructions to dismiss the motion for lack of jurisdiction). *But see United States v. Read-Forbes*, 843 F. App'x 131, 134 (10th Cir. 2021) (questioning, but not deciding, "whether [the defendant]'s failure to satisfy the substantive requirements of § 3582(c)(1)(A) is jurisdictional").

[18] *United States v. Poutre*, 834 F. App'x 473, 474 (10th Cir. 2021).

[19] *See* Doc. 117-1.

B.     **Extraordinary and Compelling Reasons**

Section 3582(c)(1)(A) requires a district court to find that "extraordinary and compelling reasons warrant a sentence reduction" before it may grant a compassionate release motion. "But neither § 3582(c)(1)(A)(i), nor any other part of the statute, defines the phrase 'extraordinary and compelling reasons' or indicates that the Sentencing Commission is charged with defining the phrase."[20] The court has "the authority to determine for [itself] what constitutes 'extraordinary and compelling reasons.'"[21] While that authority "is bounded by the requirement . . . that a reduction in sentence be consistent with applicable policy statements issued by the Sentencing Commission,"[22] the Sentencing Commission has not yet issued a policy statement "applicable" to § 3582(c)(1)(A) motions filed by a defendant. Thus, § 3582(c)(1)(A)'s consistency requirement does not currently constrain the court's discretion to consider whether extraordinary and compelling reasons warrant a sentence reduction.[23]

Barnett contends that the circumstances of his case, when combined with his age and underlying medical conditions, constitute extraordinary and compelling reasons for a sentence reduction. He asserts that the Tenth Circuit in *United States v. McGee*[24] and *United States v. Maumau*[25] identified a defendant's age at the time of the offense, the length of the sentence, and the length of time the defendant has served as appropriate factors for courts to consider in determining whether extraordinary and compelling reasons warrant a sentence reduction. And all three factors, Barnett insists, weigh in his favor: he was only 21 years old at the time of the

---

[20] *United States v. Maumau*, 993 F.3d 821, 832 (10th Cir. 2021).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] 992 F.3d 1035, 1048 (10th Cir. 2021).

[25] 993 F.3d at 837.

offense, he received a life sentence, and he has now served over 44 years in prison for this offense.[26]

Barnett's reliance on *McGee* and *Maumau* is misplaced. In both cases, the Tenth Circuit considered whether defendants could seek a sentence reduction under § 3582(c)(1)(A) based on non-retroactive amendments made by the First Step Act to the statutes governing their convictions. In *McGee*, the defendant argued that extraordinary and compelling reasons for a sentence reduction existed because, among other things, he received a mandatory life sentence under a provision of 21 U.S.C. § 841(b)(1)(A) that was later amended by the First Step Act, and his sentence would be "substantially lower" if imposed today.[27] The Tenth Circuit held that "the fact a defendant is serving a pre-First Step Act mandatory life sentence imposed under § 841(b)(1)(A) cannot, standing alone, serve as the basis for a sentence reduction under § 3582(c)(1)(A)(i)."[28] But "the combination of such a sentence and a defendant's unique circumstances" may amount to extraordinary and compelling reasons for purposes of § 3582(c)(1)(A).[29]

Following this framework set forth in *McGee*, the Tenth Circuit in *Maumau* affirmed the district court's decision granting compassionate release based on "a combination of factors," including the defendant's young age at the time of sentencing, the length of his stacked mandatory sentences under 18 U.S.C. § 924(c), the First Step Act's elimination of sentence-

---

[26] The Court notes that Barnett has not actually served over 44 years in prison for this offense. Although Barnett was sentenced in 1977, over 44 years ago, his sentence was ordered to run consecutively to the 10-year sentence Barnett was then serving for a 1974 conviction for sodomy and intent to commit rape. *See* Doc. 45.

[27] *McGee*, 922 F.3d at 1039–40.

[28] *Id.* at 1048.

[29] *Id.* (remanding the case to allow the district court to "determine whether, in [the defendant]'s case, there are unique circumstances that, in combination with the mandatory sentence he received under § 841(b)(1)(A), constitute 'extraordinary and compelling reasons' for a sentence reduction under § 3582(c)(1)(A)").

stacking under § 924(c), and the fact that he would not be subject to such a long sentence if he were sentenced today.[30] The Tenth Circuit noted that the district court's "finding of 'extraordinary and compelling reasons' was based on its individualized review of all the circumstances of [the defendant]'s case," and not on "its general disagreement with the mandatory sentences that are required to be imposed in connection with § 924(c) convictions" or "the length of [the defendant]'s sentence in particular."[31]

*McGee* and *Maumau* thus establish that a defendant's unique circumstances may, in combination with a mandatory minimum sentence imposed under a statute that has since been amended by the First Step Act, constitute "extraordinary and compelling reasons" for a sentence reduction under § 3582(c)(1)(A). But Barnett is not serving a pre-First Step Act mandatory minimum sentence—nor does he assert that he is—so the Court need not address whether he has presented unique circumstances sufficient to combine with such a sentence to satisfy the standard.

Accordingly, the Court considers whether Barnett's age and underlying medical conditions constitute extraordinary and compelling reasons for a sentence reduction without conducting an individualized review of the circumstances of his case. Barnett is 65 years old and has a body mass index of 34.6, which the Centers for Disease Control and Prevention ("CDC") defines as obese.[32] His medical records confirm that he has type 2 diabetes and asthma,[33] and

---

[30] *Maumau*, 993 F.3d at 837.

[31] *Id.*

[32] *See People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated May 13, 2021) ("Overweight (defined as a body mass index (BMI) > 25 kg/m2 but < 30 kg/m2), obesity (BMI ≥30 kg/m2 but < 40 kg/m2), or severe obesity (BMI of ≥40 kg/m2), can make you more likely to get severely ill from COVID-19. The risk of severe COVID-19 illness increases sharply with elevated BMI.").

[33] Doc. 117-1.

they indicate that he recently experienced episodes of bradycardia (slow heartbeat), for which he is prescribed medication.[34] According to the CDC, COVID-19 hospitalization and fatality rates increase with age and certain underlying medical conditions.[35] And the CDC lists obesity, diabetes, and asthma—"if it's moderate to severe"—as medical conditions that "can make you more likely to get severely ill from COVID-19."[36] Barnett does not indicate if his asthma is moderate or severe.

Although Barnett's age and underlying medical conditions of obesity and diabetes place him at an increased risk of severe illness from COVID-19, his medical records show that he received the first dose of the Pfizer-BioNTech COVID-19 vaccine the day after he filed his motion for compassionate release.[37] The record has not been updated with information about whether he has since received his second dose of the vaccine. Under applicable guidance from the CDC, however, Barnett should have received his second dose within three to six weeks of the first dose.[38] The Court thus finds it reasonable to assume that he is now fully vaccinated against COVID-19.[39]

---

[34] Doc. 128-1 at 1.

[35] *See Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last updated June 9, 2021); *People with Certain Medical Conditions*, *supra* note 32.

[36] *People with Certain Medical Conditions*, *supra* note 32.

[37] *See* Doc. 124 at 9.

[38] *COVID-19 Vaccines That Require 2 Shots*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/second-shot.html (last updated June 3, 2021).

[39] *Cf. United States v. Stiver*, No. 17-64, 2021 WL 1110593, at *1 (W.D. Pa. Mar. 23, 2021) ("The Court assumes . . . that Defendant will receive his second dose [of the COVID-19 vaccine] in the very near future and will soon be fully vaccinated."); *United States v. Shepard*, No. 07-85, 2021 WL 848720, at *5 (D.D.C. Mar. 4, 2021) ("[The defendant] received his first dose of the [COVID-19] vaccine about two weeks ago (and, presumably, will receive his second dose in the near future) . . . ."). But even if Barnett refused the second dose, he "cannot reasonably expect that prolonging [his] risk by declining vaccination will be rewarded with a sentence reduction." *United States v. Lohmeier*, No. 12-1005, 2021 WL 3657733, at *2 (N.D. Ill. Feb. 3, 2021). *See also United States v. Guerra*, No. 17-0047, 2021 WL 2581422, at *1 & n.3 (W.D. La. June 23, 2021) ("[The defendant] has received one dose of the [COVID-19] vaccine. . . . The Court can only hope that [he] has since received the second dose of the vaccine. However, even if he chose to refuse the dose, it would not alter the ultimate result, as courts have denied compassionate release where the inmate refused the COVID-19 vaccine." (citations omitted)).

The overwhelming majority of district courts to consider the issue have found that vaccination against COVID-19 changes the calculus on the "extraordinary and compelling reasons" inquiry when defendants claim that their medical conditions place them at an increased risk for severe illness from COVID-19.[40] Based on the available evidence, the Court agrees. According to the CDC, "[c]urrently authorized vaccines in the United States are highly effective at protecting people against symptomatic and severe COVID-19."[41] In clinical trials, the Pfizer-BioNTech COVID-19 vaccine, which Barnett received, was "95% effective at preventing laboratory-confirmed infection with the virus that causes COVID-19"[42] in those without prior infection and "100% effective at preventing severe disease."[43] "The vaccine was also highly effective in clinical trials at preventing COVID-19 among people of diverse age, sex, race, and ethnicity categories and among people with underlying medical conditions."[44] The available evidence thus shows that the authorized COVID-19 vaccines, including the Pfizer-BioNTech vaccine, are safe and highly effective at preventing severe cases of COVID-19, even among older people and people with underlying medical conditions.

---

[40] *United States v. Harris*, No. SAG-05-61, 2021 WL 1516012, at *2 (D. Md. Apr. 16, 2021) (collecting cases). The same is true of defendants who have received only one dose of a two-dose vaccine regimen. *See, e.g.*, *United States v. Rodriguez*, No. 15-254, 2021 WL 1187149, at *1 (D. Minn. Mar. 30, 2021) ("Given that [defendant] is or will soon be fully vaccinated against COVID-19, the Court concludes that [the defendant's] obesity and hypertension are not extraordinary and compelling reasons justifying his release." (citations omitted)); *United States v. Brown*, No. 16-CR-436, 2021 WL 1154207, at *3 (S.D.N.Y. Mar. 26, 2021) ("Because [the defendant] will soon be fully vaccinated, any risk that he may become severely ill from COVID-19 will be reduced significantly."); *Shepard*, 2021 WL 848720, at *5 ("Given that [the defendant] received his first dose of the vaccine about two weeks ago (and, presumably, will receive his second dose in the near future), he cannot show that he needs to be released from prison to protect him from risks associated with COVID-19.").

[41] *Interim Public Health Recommendations for Fully Vaccinated People*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last updated May 28, 2021).

[42] *Pfizer-BioNTech COVID-19 Vaccine Overview and Safety*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Pfizer-BioNTech.html (last updated June 24, 2021).

[43] Kathy Katella, *Comparing the COVID-19 Vaccines: How Are They Different?*, Yale Med., https://www.yalemedicine.org/news/covid-19-vaccine-comparison (last updated July 1, 2021).

[44] *Pfizer-BioNTech COVID-19 Vaccine Overview and Safety*, *supra* note 42.

Nonetheless, Barnett advances three reasons why he believes that the COVID-19 vaccines offer inadequate protection.[45] First, Barnett questions the efficacy of the vaccines against new variants of the COVID-19 virus. Although the evidence is limited, "[s]o far," the CDC states, "studies suggest that the current authorized vaccines work on the circulating variants."[46] Based on what we know at this time, the Court cannot conclude that the vaccines offer inadequate protection against variants of the COVID-19 virus.[47]

Second, Barnett contends that "experts now suggest" that vaccination alone will not suffice to prevent COVID-19 outbreaks in prisons, where social distancing is not an option and vaccine hesitancy is high among staff.[48] While COVID-19 outbreaks are particularly challenging to control in prisons, and vaccine hesitancy is of serious concern, the BOP has undertaken "extensive and professional efforts to curtail the virus's spread."[49] Out of the 129,610 federal inmates in BOP-managed institutions, the BOP reports that only 30 inmates nationwide currently have confirmed positive COVID-19 test results.[50] FCI Hazelton, where Defendant is incarcerated, currently has zero active COVID-19 cases among inmates and only

---

[45] Barnett also argues that one dose of the Pfizer-BioNTech Covid-19 vaccine offers less protection that two. Because the Court assumes that, by now, Barnett has received his second dose of the vaccine, the Court does not address this argument.

[46] *About Variants of the Virus That Causes COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/variants/variant.html (last updated June 28, 2021).

[47] *See United States v. Singh*, ---F. Supp. 3d---, No. 15-CR-00028-11, 2021 WL 928740, at *4 (M.D. Pa. Mar. 11, 2021) ("It is, of course, possible that future research will demonstrate that current, or future, COVID-19 variants mitigate the effectiveness of the . . . vaccine to such an extent that the vaccine no longer provides individuals with effective protection. However, [the defendant] has not demonstrated that such is the case today and, it bears emphasizing, the burden falls upon [the defendant] to demonstrate that compassionate release is warranted."); *see also United States v. White*, No. 15-CR-20040-01, 2021 WL 964050, at *2 (E.D. Mich. Mar. 15, 2021) (finding the defendant's "concern about vaccine effectiveness against new strains of COVID-19" speculative based on available evidence).

[48] Doc. 125 at 8.

[49] *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

[50] *COVID-19 Coronavirus*, Fed. Bureau of Prisons, https://www.bop.gov/coronavirus (last visited July 6, 2021).

one among staff.[51]  And its neighboring facility, USP Hazelton, has no active COVID-19 cases among either inmates or staff.[52]  In this respect, Barnett cannot show a particularized risk of contracting COVID-19 at his facility.[53]  To the extent Barnett fears that FCI Hazelton will see another COVID-19 outbreak in the future, that general concern alone is not sufficiently extraordinary or compelling to warrant a sentence reduction.[54]

Third, Barnett asserts that the COVID-19 vaccines may offer less protection to obese individuals.[55]  While researchers have speculated that the vaccines may be less effective in obese individuals, initial results from the Pfizer-BioNTech and Moderna COVID-19 vaccine trials suggest that the vaccines "have similar efficacy among individuals with and without obesity."[56]  Barnett points to preliminary data from a small study of about 250 health-care workers that found antibody responses in obese individuals were lower seven days after receiving their second dose of the Pfizer-BioNTech vaccine.  But the author of the article Barnett cites discussing this study states that "it is too soon to know what this means for the efficacy of the vaccine," and the researchers who conducted the study themselves acknowledge that "further studies are

---

[51] *Id.*

[52] *Id.*

[53] *See, e.g.*, *United States v. Garrison*, No. 14-CR-231-WJM, 2021 WL 2633426, at *2 (D. Colo. June 25, 2021) ("[E]xtraordinary and compelling circumstances generally do not exist where there are no confirmed cases of the virus at the prisoner's facility." (citations omitted)).

[54] *See Raia*, 954 F.3d at 597 ("[T]he possibility that [COVID-19] may spread to a particular prison cannot independently justify compassionate release . . . .").

[55] Doc. 125 at 9 (first citing Linda Geddes, *Pfizer Vaccine May Be Less Effective in People with Obesity, Says Study*, The Guardian (Feb. 28, 2021), https://www.theguardian.com/world/2021/feb/28/pfizer-vaccine-less-effective-obesity-study; and then citing Sarah Verney, *America's Obesity Epidemic Threatens Effectiveness of Any COVID Vaccine*, Kaiser Fam. Found. (Aug. 6, 2020), https://khn.org/news/americas-obesity-epidemic-threatens-effectiveness-of-any-covid-vaccine/).

[56] Matthey J. Townsend, Theodore K. Kyle, & Fatima Cody Stanford, *COVID-19 Vaccination and Obesity: Optimism and Challenges*, 29 Obesity J. 634, 634 (2021) (examining Phase 3 clinical trial results for the Pfizer-BioNTech and Moderna COVID-19 vaccines).  "Careful follow-up in placebo-controlled studies is required to generate data on long-term vaccine immunogenicity, particularly in high-risk groups."  *Id.*

needed."⁵⁷ Further, scientists "do not yet understand whether antibody titers accurately predict waning immunity or increased susceptibility to severe disease."⁵⁸ Barnett has thus not shown that the obese individuals remain at an increased risk for severe illness from COVID-19 despite vaccination.⁵⁹

All told, the evidence shows that Barnett is inoculated against COVID-19 with a vaccine that is extremely effective at preventing infection and that virtually eliminates the risk of severe illness in the few who contract COVID-19 after vaccination. While "there can be no bright-line rule that a vaccinated individual is no longer at compellingly elevated risk,"⁶⁰ Barnett has provided no evidence or persuasive argument suggesting that, despite vaccination, he remains at an increased risk for severe illness from COVID-19.⁶¹ Under these circumstances, the Court finds that Barnett's age and medical conditions do not constitute "extraordinary and compelling reasons" warranting his release under § 3582(c)(1)(A).

### C. Section 3553(a) Factors

Even if Barnett had met his threshold burden of establishing extraordinary and compelling reasons for a sentence reduction, the § 3553(a) sentencing factors counsel against releasing him.⁶² Those factors include: (1) "the nature and circumstances of the offense and the

---

⁵⁷ Geddes, *supra* note 55.

⁵⁸ Townsend et al., *supra* note 56, at 634.

⁵⁹ *Cf. United States v. Burks*, No. 11-3694, 2021 WL 1291935, at *2 (D. Minn. Apr. 7, 2021) ("[The defendant's] claim that the vaccine may offer less protection to obese individuals is purely speculative . . . .").

⁶⁰ *United States v. Harris*, No. SAG-05-61, 2021 WL 1516012, at *2 (D. Md. Apr. 16, 2021).

⁶¹ *See, e.g.*, *United States v. Gomez-Vega*, No. 19-1382-1, 2021 WL 1339394, at *3 (D.N.M. Apr. 9, 2021) ("[A]bsent any evidence or argument combatting the efficacy of the vaccine's protection to mitigate his medical concerns, the Court is strained to accept that [the defendant's] conditions constitute extraordinary and compelling reasons for compassionate release.").

⁶² *See United States v. Maumau*, 993 F.3d 821, 831 (10th Cir. 2021) ("[Section] 3582(c)[(1)(A)] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, [a sentence] reduction . . . is warranted in whole or in part under the particular circumstances of the case." (second and third alterations in original) (quoting *United States v. Jones*, 980 F.3d 1098, 1107 (6th Cir. 2020))).

history and characteristics of the defendant"; (2) "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (3) "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct"; and (4) "the need for the sentence imposed . . . to protect the public from further crimes of the defendant."[63]

Barnett is serving a life sentence for a serious and violent offense, the nature and circumstances of which are particularly heinous. On October 14, 1976, Barnett followed a 64-year-old museum curator into the staff restroom at the Fort Leavenworth Museum, where he brandished a linoleum knife and told her that he had been without a woman for three years, indicating that he intended to rape her. As the victim attempted to leave the restroom, Barnett beat her so severely with his fists that she lost vision in one eye. He also said that he would need to kill her so there would be no witness. Barnett then removed her clothing below her waist, but he did not penetrate her because he was impotent. When a phone a began to ring, the victim managed to distract Barnett and escape. A jury subsequently convicted Barnett of kidnapping, assault, and maiming.

This was not Barnett's first offense. In 1970, Barnett, then a juvenile, was charged with rape, but the charges were later dismissed because the victim refused to cooperate. Two years later, Barnett was arrested for "molesting or attempted rape," but there is no record of any charges being filed.[64] Less than three months later, Barnett was charged with first degree rape. Those charges were later reduced to assault and battery, to which Barnett pleaded guilty.

---

[63] 18 U.S.C. § 3553(a).
[64] PSR at 4.

13

In 1973, when Barnett turned 18, he enlisted in the United States Marine Corps under the name "James Dewayne Barnett, Jr." Military authorities did not discover his juvenile record because it was under the last name "Downey." Merely three months after enlisting, Barnett was charged with rape of a female civilian employee. He was tried by a general court-martial and acquitted. Then, seven months later, Barnett was charged with two counts of sodomy and one count of intent to commit rape. He was again tried by general court-martial. This time, he was found guilty. Barnett was sentenced to "ten years confinement, at hard labor."[65] It was while he was on a work detail two years later at the Fort Leavenworth Museum that Barnett committed the offense at issue in this case.

And this was not the last offense Barnett committed. In 1985, while in custody at FCI El Reno in Oklahoma, Barnett assaulted a female correctional officer "with the intent of performing sexual intercourse."[66] Barnett stabbed the victim's face, throat, neck, and right eye with a steel rod sharpened to a point. Barnett subsequently pleaded guilty to assaulting a correctional officer with a deadly weapon, and he was sentenced to a 10-year term of imprisonment, to run consecutively to any other sentence imposed. In short, Barnett's lengthy criminal history, which began as a juvenile and continued unabated into adulthood, indicates that he carries a propensity for sexual violence.

The Court also considers aspects of Barnett's character beyond his criminal history, including his participation in prison programming and his disciplinary record, to assess his history and characteristics as well as the likelihood that he will reoffend.[67] During his time in

---

[65] *Id.* at 5.

[66] W.D. Okla. Case No. 85-00188, PSR at 1.

[67] *See Pepper v. United States*, 562 U.S. 476, 491 (2011) (stating that "evidence of postsentencing rehabilitation may be highly relevant" under § 3553(a) because it provides the "most up-to-date picture of [the

14

prison, Barnett has taken hundreds of hours of educational and vocational courses in a range of subjects, including electrical work, HVAC repair, computer concepts, metalworking, welding, business management, science, finance, leadership, etc.[68] And before the COVID-19 pandemic swept the United States, Barnett taught inmates to read music and play instruments, including the saxophone, bass guitar, lead guitar, and piano. Barnett states that he also "conducts other prisoners in bands who play at graduation ceremonies at the institution."[69]

While Barnett has shown initiative by earning his GED in prison, completing a range of educational and vocational courses and teaching other inmates to read music and play instruments, the Court is not assured that his pattern of sexual violence will not repeat itself if he is released. As the government points out, Barnett's disciplinary record is four pages long and includes infractions for attempted sexual assault and possessing a weapon in 1994, and again for possessing a weapon in 2004. The Court recognizes that Barnett has not engaged in any violence since 1994 and that the BOP currently classifies Barnett's recidivism risk as "low,"[70] but the Court cannot conclude, on this record, that Barnett no longer presents a danger to the public.

Barnett asks the Court to consider his age as evidence that he is no longer dangerous. He notes that the U.S. Sentencing Commission has found that "[o]lder individuals are substantially less likely to recidivate as compared with younger offenders," citing a 2017 report titled *The Effects of Aging on Recidivism Among Federal Offender*.[71] While this may be true, the U.S.

---

defendant]'s 'history and characteristics'" and "sheds light on the likelihood that [the defendant] will engage in further criminal conduct" (quoting 18 U.S.C. § 3553(a))).

[68] *See* Doc. 117-1.

[69] Doc. 125 at 10–11.

[70] Doc. 125-3.

[71] Doc. 125 at 12 (citing U.S. Sentencing Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 3 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf ("Over an eight-year follow-up period, 13.4 percent of offenders age 65 or

Sentencing Commission has also found that violent offenders recidivate at a higher rate than non-violent offenders in all age groups, "and the gap between the two groups widens as age at release increases."[72] In a 2019 report, the U.S Sentencing Commission explained:

> Recidivism rates for violent offenders were relatively high across age groups and did not decline as rapidly as the rates for non-violent offenders in the older age groups. This result for violent offenders is not consistent with the relationship between age at time of release and recidivism rates for all federal offenders discussed in the Commission's previous publication, *Effects of Ag[ing] on Recidivism Among Federal Offenders*, and prior studies, which have repeatedly shown a more precipitous decline in recidivism rates as age increases. . . . This substantial difference in recidivism rates persists for the oldest age group. Over one-third (36.4%) of violent offenders released after the age of 50 recidivated—this rate remains more than twice as high as the rate for non-violent offenders released after age 50 (15.2%)."[73]

So, although Barnett is now 65 years old, his risk of recidivism remains much higher, statistically speaking, than that of non-violent offenders of the same age.

After considering the sentencing factors set forth in § 3553(a), the Court concludes that reducing Barnett's sentence to time served would not reflect the seriousness of his offense, afford adequate deterrence, provide appropriate punishment, or protect the public from his further crimes. The pertinent § 3553(a) sentencing factors thus do not favor the sentence reduction that Barnett's motion seeks.

The Tenth Circuit requires the defendant to show that § 3582(c) authorizes relief for the Court to have jurisdiction. Barnett has failed to make that showing here. Accordingly, the Court must dismiss the motion for lack of jurisdiction.

---

older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release.")).

[72] U.S. Sentencing Comm'n, Recidivism Among Federal Violent Offenders 16 (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf.

[73] *Id.* (footnotes omitted).

16

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant James Dewayne Barnett's Motion for Compassionate Release (Doc. 117) is **dismissed without prejudice for lack of jurisdiction**.

**IT IS SO ORDERED**

Dated: July 6, 2021

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE